Patricia CRONIN, Appellant,

v.

Dr. Edward J. HAGAN, Appellee.

No. 56137.

Supreme Court of Iowa.

Sept. 18, 1974.

O'Brien, Galvin & O'Brien, Sioux City, for appellant.

Robert E. Beebe and Maurice B. Nieland of Kindig, Beebe, McCluhan, Rawlings & Nieland, Sioux City, for appellee.

Heard before MOORE, C. J., and MASON, REES, REYNOLDSON, and McCORMICK, JJ.

MASON, Justice.

Patricia Cronin originally brought a medical malpractice suit against Doctors Hagan (spelled Hagen in some portions of the record) and Howard. The trial court directed a verdict for Dr. Howard and the jury returned a verdict for defendant Hagan. Plaintiff appeals alleging various errors.

Plaintiff, married and the mother of five children, began experiencing gynecological problems in 1967. About that time she became a patient of Dr. Edward Hagan, M. D., a licensed physician of the state of Iowa, specializing in obstetrics and gynecology and practicing in Sioux City. Her discomfort and other problems continued until April 1970 when defendant advised her a hysterectomy was warranted. Plaintiff had been expecting the necessity of such an operation and agreed to undergo surgery within a week. Although plaintiff expressed reservations about having the operation performed vaginally instead of abdominally, defendant assured her that procedure was proper and effective and would have the additional benefit of allowing him to make other necessary repairs.

Friday, April 10, plaintiff underwent a hysterectomy. A hysterectomy, as disclosed by the medical testimony, involves surgical removal of the uterus and repair of any weaknesses in the bladder or the entrance of the urethra into it. The right ureter is within about one and one half centimeters of the cervix and therefore great care must be exercised to avoid injury to the ureter. The day following the operation plaintiff felt very ill, was nauseous, could not retain liquids and had pain in her right flank. Monday she was still sick and nauseous and refused to take any medication until the cause of her distress was diagnosed. Plaintiff is allergic to sulfa but had been receiving a drug containing sulfa; after defendant prescribed a different drug the nausea ceased and plaintiff could once again retain liquids. The pain in her right side continued and worsened.

Thursday, April 16, defendant ordered X rays of plaintiff's urinary tract; they revealed a partial blockage of the right ureter. A urologist, Dr. Howard, was consulted and he performed a cystoscopy the following day. Attempts to dispel the partial blockage by insertion of a catheter into the ureter were unsuccessful. Dr. Howard then advised exploratory abdominal surgery for the purpose of relieving any obstruction possibly found in the lower end of the right ureter. Assisted by Dr. Hagan, such surgery was performed by Dr. Howard Saturday, April 18.

This operation revealed ligatures or sutures and adhesions very close to the blocked area of the ureter. However, there were no ligatures or stitches going through or around the ureter. The ligatures and adhesions in the area of the partial blockage of the ureter were a result of the hysterectomy and were putting pressure on the ureter. Dr. Howard was easily able to "free up" the ureter at this time. He also inserted a tube up the right ureter from the bladder to the kidney; the tube encountered no blockage and immediately began to drain completely the right kidney. This tube was left in place and surgery

completed. Thereafter, plaintiff experienced no more pain in her right side.

Five days later the ureter tube was removed and shortly thereafter plaintiff was released from the hospital. Approximately four days later plaintiff began to have considerable drainage from the abdominal wound. Later when urine began seeping from the wound plaintiff returned to the hospital. X rays and another cystoscopy revealed a fistula or small opening in the right ureter in the same area where the partial blockage had originally been encountered. This fistula had developed from pressure on the ureter from ligatures, sutures and adhesions in the area resulting from the hysterectomy. The pressure led to necrosis or deadening of tissue of the ureter and ultimately to the fistula. Utilizing conservative treatment a tube or catheter was again placed in the right ureter in the hope that the fistula would heal by itself. This catheter was left in for ten days but within a few hours of its removal plaintiff again experienced pain and leakage as before.

It was then determined a third operation would have to be performed. Plaintiff was informed at this time that it might be necessary to remove the right kidney. The operation was performed and the kidney removed.

Plaintiff thereafter brought suit against Dr. Hagan and later, in an amended petition, against Dr. Howard. The trial court sustained a motion for directed verdict by Dr. Howard and that ruling is not a subject of this appeal.

Plaintiff's petition is in three divisions. Division 1 is based on the doctrine of res ipsa loquitur, the second on a theory of specific negligence and the third relies on the allegation defendant's treatment was so obviously negligent as to be within the common knowledge of the general public.

Plaintiff and her husband both testified in support of her petition. She also called

defendant and Dr. Howard for interrogation. Section 624.1, The Code.

At the close of plaintiff's evidence defendant and Dr. Howard moved for directed verdict as to all divisions. It was then overruled. Defendant then adopted his testimony and that given by Dr. Howard when called by plaintiff and rested. Dr. Howard followed the same procedure. There was no rebuttal.

Defendant and Dr. Howard then renewed the motions previously made and defendant incorporated the grounds and reasons urged by Dr. Howard in his motion for directed verdict as a basis for a favorable ruling. As indicated, motion for directed verdict in favor of Dr. Howard was sustained. Defendant's motion was again overruled. In response to an inquiry by defendant's counsel as to whether all of defendant's motions were overruled on all divisions the court informed counsel they were at that time but when the instructions were considered it would then be determined what was to be submitted to the jury. The court indicated it had not had an opportunity to study the briefs presented and that the ruling as made at the time was for the record.

Later the court made further record with regard to defendant's motion for directed verdict before overruling it. The court then sustained defendant's motion to withdraw from consideration of the jury all specifications of negligence asserted in paragraph 2 of division 2 except the allegation in subparagraph a thereof that defendant was negligent "in performing said operation in a manner failing to identify, isolate, and protect the right ureter of the Plaintiff resulting in same being completely blocked for a period of eight days."

Shortly thereafter counsel were furnished copies of the proposed instructions and given opportunity to make objections and take exceptions. At this point plaintiff objected to the court's failure to in-

struct on the doctrine of res ipsa loquitur. The objection was overruled without comment.

The appeal presents three issues for review: (1) Did the trial court err by refusing to submit the case to the jury under the doctrine of res ipsa loquitur? (2) Should the question of defendant's negligence in failing to discover the difficulty in the ureter for eight days have been submitted to the jury? and (3) Was it proper to withdraw from consideration of the jury the issue as to defendant's negligence in ordering sulfa drugs for plaintiff under the facts in the record?

I. The first issue presented for review —applicability of the doctrine of res ipsa loquitur—is raised by plaintiff's assignment of error wherein she contends the trial court erred in refusing to submit the case to the jury on the theory of res ipsa loquitur.

Although plaintiff's assignment simply states the trial court erred in refusing to submit the case to the jury under the doctrine of res ipsa she argues almost exclusively that the court erred in not giving her requested instruction. The assignment, however, must be predicated on the court's sustaining the directed verdict as to division 1 rather than as to refusal to give a specific instruction.

Schneberger v. Glenn, 176 N.W.2d 782, 784 (Iowa 1970), gives a concise summary of the principles governing scope of review following a motion for directed verdict:

"In passing upon motions to direct verdicts for a defendant, the court is required to view the evidence in the light most favorable to the plaintiff it will reasonably bear. * * * [citing authority] If reasonable minds might differ on the evidential questions, then a fact or jury question is presented and the motion to direct the verdict should be overruled. * * * [citing authority] A movant for a directed verdict must be considered as admitting the truth of all evidence offered by the adverse party and every favorable inference which may be fairly and reasonably deduced therefrom. * * * [citing authority] A jury question is engendered where facts are not in dispute or not contradicted if reasonable minds might draw different inferences from them. * * * [citing authorities]." See also Winter v. Honeggers' & Co., Inc., 215 N.W.2d 316, 321 (Iowa 1974) and authorities cited.

■ Before submission of a case on the theory of res ipsa loquitur plaintiff must prove existence of essential facts necessary to bring the rule into operation. They are: (1) exclusive control and management of the instrumentality which caused the injury complained of by the person charged with negligence and (2) an occurrence causing the injury which was of such a type as in the ordinary course of events would not have happened if reasonable care had been used. Wiles v. Myerly, 210 N.W.2d 619, 624–625 (Iowa 1973); Perin v. Hayne, 210 N.W.2d 609, 614 (Iowa 1973); Fischer, Inc. v. Standard Brands, Inc., 204 N.W.2d 579, 583 (Iowa 1973), and authorities cited in these opinions. In the absence of either of these elements the doctrine does not apply. Lagerpusch v. Lindley, 253 Iowa 1033, 1038, 115 N.W.2d 207, 210 and Wiles v. Myerly, 210 N.W.2d at 625.

"* * * The question whether the particular occurrence is such as would not happen if reasonable care had been used rests on common experience and not at all on evidence in the particular case that tends in itself to show such occurrence was in fact the result of negligence.

"When both essential elements for application of the doctrine are established the happening of the injury itself permits but does not compel the drawing of an inference that defendant was in fact negligent. * * * Of course, the res ipsa loquitur inference fails if such injurious occurrence is shown to be of such a nature as can ordinarily happen despite due care." Wiles v. Myerly, 210 N.W.2d at 625.

This foundational fact may be established by testimony showing the common experience of experts. Perin v. Hayne, 210 N.W.2d at 614–615.

This court must examine the evidence in light of the principle stated above and determine whether plaintiff presented substantial competent evidence of sufficient weight to generate a jury question as to the existence of the foundational facts giving rise to the res ipsa loquitur inference.

Expert medical testimony showed that in performing a hysterectomy it is necessary to place sutures or ligatures within approximately one and one half centimeters of the ureters. This operation was no exception and ligatures were necessarily placed in close proximity to plaintiff's right ureter; there were no ligatures placed through or around the ureter, however. Specific testimony must be examined.

The following testimony was given by Dr. Howard:

"Q. And you have indicated that while a suture was not blocking it, these ligatures and adhesions were drawn tight over it causing this kinking? A. I'd prefer to say—to not use the word 'kinking' exactly. * * *

"Q. Change the question just with reference to that, blockage then. A. The ligatures were in very close proximity to the ureter and I feel were causing pressure on the ureter and thus decreasing the lumen of the ureter and thus, in turn, the obstruction of the ureter.

"Q. And ligatures, those ligatures that you saw, were the result of the hysterectomy? A. These ligatures were the result of tying off the blood vessels necessary to control bleeding at the time of the hysterectomy."

Later Dr. Howard gave his opinion of the cause of the injury complained of:

"I think, based upon my judgment and my findings, that the fistula in this ureter was caused by ligatures placed in the proximity of this ureter which, in turn, *along with swelling and edema and reaction,* caused pressure on this ureter to interfere with the blood supply to a small portion of this ureter which, under most circumstances would heal by—would heal satisfactorily but in this patient did not heal and close off as we had expected." (Emphasis supplied)

Plaintiff presented no expert testimony showing the ligatures alone were the cause of the partial blockage and ultimately the fistula and removal of the kidney. The only testimony on plaintiff's behalf tending to show the ligatures themselves were the cause was testimony by Dennis Cronin regarding a conversation he had with Dr. Howard following the exploratory surgery. He stated:

"* * * Dr. Howard told me that they had done the exploratory operation and found that there had been some muscles and/or tissues, I don't remember exactly, pulled across the ureter and kinked it off but they had freed it up and that she should be all right and the stitches—stitching had just been too tight. * * *

"* * *
"Well, Dr. Howard explained to me what had happened, what they had found about the muscles and—the muscles and/or tissues being pulled across the ureter. He said the muscles or tissues were pulled across the ureter too tight and kinked it off during the hysterectomy or as a result of the hysterectomy."

It would appear, however, that in his own testimony Dr. Howard fully explained what caused the injury.

In brief, the evidence is that the pressure on the ureter was caused by a build up of adhesions and swelling, edema, and reaction to the ligatures necessarily placed within approximately one and one half centimeters of the ureter. Dr. Howard tells us the adhesions are "* * * little tissue bands, that are a little bit tougher than the ordinary tissue around it and

those occur due to Nature's way of reacting to irritation, inflammation or infection."

■ "* * * Rarity of the occurrence is not a sufficient predicate for application of res ipsa loquitur. 'Where risks are inherent in an operation and an injury of a type which is rare does occur, the doctrine should not be applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than some cause for which the defendant is not responsible.' * * * [citing authorities]." Perin v. Hayne, 210 N.W.2d at 615.

The inquiry here must be directed to the occurrence that led to the injury complained of, the suturing within approximately one and one half centimeters of the right ureter. Plaintiff presented evidence of what occurred to her but the only expert testimony was that of defendant and particularly Dr. Howard.

■ Whether the growth of adhesions and other bodily reactions causing necrosis of a ureter (the cause of the ultimate injury here) was an occurrence which in the ordinary course of things would not happen if reasonable care had been used is in our view a question for expert testimony. That is, the common knowledge and everyday experience of an average layman is not sufficient to qualify him to give competent testimony regarding such matter.

Dr. Howard testified: "It is amazing how close those ureters pass next to the uterus and particularly to the cervix. * * * And those ureters come within a centimeter and a half of the edge of that cervix. * * * [T]he dissection must go, right close to the cervix to stay away from those ureters. * * *

"* * *

"And I think every skilled gynecological surgeon knows this and he or she tries desperately to stay close enough and it is always in mind about to take precautions against injury to the ureters. * * *."

He testified earlier the fistula was caused by pressure from ligatures placed in the vicinity of the ureter when coupled with swelling, edema and reaction.

There is no basis in the record for contending the occurrence would not have happened in the ordinary course of things if reasonable care had been used. Indeed, it seems this occurrence was an inherent risk of the operation and, though rare, could happen even with the exercising of due care.

■ The evidence is insufficient to generate a jury question as to the existence of this foundational fact. This essential of the doctrine being absent the doctrine does not apply. Wiles v. Myerly, 210 N.W.2d at 625. The trial court did not err in refusing to submit it. Therefore, we do not reach the propriety of the trial court's refusal to give what is referred to in Tomei v. Henning, 67 Cal.2d 319, 62 Cal.Rptr. 9, 11, 431 P.2d 633, 635 n. 1, as "a conditional res ipsa loquitur instruction."

II. In regard to the second issue presented for review plaintiff contends the trial court erred in not submitting to the jury the specification defendant was negligent in not promptly discerning the problem with the ureter. Basically, plaintiff argues defendant was negligent in waiting eight days before ordering the test which revealed the partial blockage.

It is unclear which ruling by the trial court plaintiff asserts as error here. The trial transcript shows plaintiff offered an amendment to conform to proof alleging the specification of negligence concerning delayed diagnosis. This amendment was offered by plaintiff after the instructions had been submitted to counsel for the purpose of making a record of their objections and exceptions. The objection made then was not to trial court's refusal to allow the amendment but to the refusal to instruct the jury on the specification of negligence contained therein. The record shows no motion by plaintiff to amend the petition

to conform to the proof. Of course, there was no action on the amendment by the trial court.

In her brief plaintiff simply asserts error in the court's refusal to submit the specification of negligence. It is clear that in her brief plaintiff does not attack any refusal by trial court to allow amendment to conform to proof.

The motion for new trial alleged, "That the Court erred in refusing to include in the instructions the item of neglect of medically due care; specifically in failing to discern the difficulty with the right ureter of the Plaintiff for a period of 8 days after the original operation."

It appears this assignment attacks the court's ruling denying a new trial in regard to the refusal to submit this specification of negligence. Such will be considered as the assignment.

Plaintiff would have been on firmer ground had she made a proper motion to amend the petition to conform to the proof and then assigned error on the trial court's denial. Such was not done, however, as shown by the record.

The trial court's ruling on the new trial motion found the contention asserted without merit on both procedural and substantive grounds. Relating to procedural grounds the court stated: "Plaintiff's complaint of the Court's failure to submit the question of Dr. Hagen's negligence in post-operative treatment is without merit. Such allegation is not contained in the Petition; was not covered by Plaintiff's objections to instructions and is not supported by the record."

The petition clearly does not specify defendant was negligent in post-operative care relating to discovery of the partial blockage. As noted above, we are not asked to find error in any refusal to allow amendment to conform to the evidence. Rule 88, Rules of Civil Procedure.

This court has repeatedly held the trial court must submit only those issues raised by both pleadings and proof. Dopheide v. Schoeppner, 163 N.W.2d 360, 364 (Iowa 1968); Adams v. Deur, 173 N.W.2d 100, 113 (Iowa 1969); and Wenndt v. Latare, 200 N.W.2d 862, 870 (Iowa 1972). Since plaintiff failed to plead this specification of negligence she had no right to have it submitted to the jury.

This assignment is without merit.

III. The remaining issue presented for review arises from the trial court's refusal to submit as a specification of negligence the giving of sulfa content drugs to plaintiff when defendant knew or had reason to know from examination of plaintiff's hospital record on admission she was allergic to sulfa.

This contention was urged by plaintiff in objections to instructions and again in motion for new trial. The trial court determined there was no testimony that plaintiff's symptoms were obscured or that her condition with respect to the fistula or kidney was affected thereby. The court concluded the motion lacked merit.

Defendant prescribed the drug Urobiotic which contains sulfa. For three days following the hysterectomy plaintiff was nauseous and generally felt very sick. After defendant examined plaintiff's record which showed she was allergic to sulfa he prescribed a nonsulfa drug and plaintiff's nausea ceased.

In support of the trial court's ruling defendant insists plaintiff had failed to introduce any competent evidence of proximate causation between the prescribing of the drug containing sulfa and the ultimate loss of the kidney by plaintiff.

Plaintiff testified she was allergic to sulfa and that for three days after the hysterectomy she suffered from nausea; the nausea ceased when a nonsulfa drug was later prescribed. She presented no expert testimony linking the prescription of the

drug to the injuries complained of, or even to the fact that nausea was caused by the drug.

Dr. Howard testified that during the period of nausea less fluid would go to the kidneys but after the nausea ceased there would be a greater thirst and probably plaintiff would ingest a greater amount of liquids. The doctor was asked, "Now, taking those factors into consideration, do you have an opinion as to whether the taking of the drug and its results as described to you would have made it less able for her ultimate ureteral problem to be discovered?". He replied, "Perhaps very slightly."

As we understand plaintiff's position she insists defendant's negligence in prescribing the sulfa drug ultimately caused the injury complained of; thus, the drug caused the nausea which in turn inhibited prompt diagnosis of the partial blockage which in turn led to the loss of the kidney.

In the first place Dr. Howard expressed the view a kidney could function normally even if completely blocked for eight days; here there was only a partial blockage.

Next, there was expert testimony the nausea could have been caused by other factors; indeed, some patients have a great deal of nausea after surgery while others have none. But there is no expert evidence the nausea was probably caused by an allergic reaction to the sulfa drug. As a matter of fact, there was no testimony, expert or otherwise, expressing the opinion that the sulfa drug "might have," "may have," or "could have" caused or "possibly did" cause plaintiff's nauseous condition.

The question of the sufficiency of evidence to create a jury question as to whether there was a causal relationship between the alleged negligence and the injury sustained by plaintiff is discussed in Winter v. Honeggers' & Co., Inc., 215 N. W.2d at 323. The record here, even when viewed in the light most favorable to plaintiff, does not tend to establish either the first or second part of the test announced in the cited case.

 There was insufficient evidence to create a jury question as to whether there was a causal relationship between the sulfa drug and plaintiff's nausea.

The case is therefore

Affirmed.